[Liverpool and London and Globe Ins. Co. v. Goehring.]

small. There was no necessity for depositing money in bank, which should have been forthwith paid to those whose liens were divested by the sale, and permitting it to remain there for months. The excuse given by the assignee for not paying out the money to recognized lien creditors was, that his attorney advised him that he could not safely pay until the fund was distributed by an auditor. In this he is not borne out by the testimony of his attorney, Mr. Kimmel. He testified that he told the assignee it was better not to pay out any money until an auditor was appointed to make distribution, "except where he knew it would be safe to pay, where he knew it would be allowed." They both knew that nearly the whole fund could have been safely paid. Some time after the money was deposited they did pay Mr. Black $1,000 on account of his extinguished liens, and it would have been equally safe to have paid the whole of it at an earlier date.

For these and other reasons given by the auditor, and concurred in by the court below, we think the relief prayed for was rightly refused.

But, for the reason heretofore given, we can do nothing more than quash the writ on which the record was brought before us.

Writ of certiorari quashed.

# Liverpool and London and Globe Insurance Company *versus* Goehring.

1. Where, in pursuance of the terms of a policy of insurance, the amount of a loss under the policy is submitted to arbitrators agreed upon by the insured and the company, the legal presumption is that such arbitrators have, in making their award, done their duty. This presumption can only be rebutted by clear evidence of fraud, misconduct or mistake.

2. The facts of this particular case held not to disclose any evidence of fraud or misconduct on the part of the arbitrators.

3. An award of arbitrators will not be set aside on the ground of mistake where it is doubtful whether a mistake has been committed, and where, even if it has, the mistake is of so insignificant a character as to be unworthy of attention.

October 25th 1881. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, STERRETT and GREEN, JJ. TRUNKEY, J., absent.

ERROR to the Court of Common Pleas of *Westmoreland county:* Of October and November Term 1880, No. 87.

[Liverpool and London and Globe Ins. Co. *v.* Goehring.]

Debt, on a policy of fire insurance for $2,500, by Jacob Goehring against the above named company, to recover for a loss sustained by the destruction by fire of the plaintiff's hotel. The policy contained, inter alia, the following clause:

"If differences shall arise between the parties touching any loss or damage after proof thereof has been received in due form, the matter shall, at the written request of either party, be submitted to two impartial arbitrators, mutually chosen, whose award and that of an umpire, if one is necessary, in writing, shall be binding upon the parties as to the amount of such loss or damage, but shall not decide the liability of this company under the policy."

After proofs of loss had been furnished, a dispute arose between the parties as to the amount of damage, whereupon the parties agreed in writing upon the appointment of two arbitrators to appraise the damage actually caused by said fire. Goehring was also insured in the Lycoming Fire Insurance Company, and the same appraisers were agreed on to appraise the damage under that policy. The arbitrators, after being sworn to perform their duties with impartiality, met at the site of the fire in the presence of Goehring and the representatives of the said insurance companies, and spent a considerable portion of the day in their investigations. They made a report, estimating the total damage at $4,013.89, of which amount the insurance company defendant agreed to pay their proportion. The plaintiff, however, declined to accept the award, and brought this suit against the company defendant.

On the trial, before HUNTER, P. J., the plaintiff claimed that the arbitrators had been guilty of misconduct, which vitiated their award. The plaintiff's testimony on this point was as follows: "It was decided that the arbitrators should come down. So the Lycoming gentleman, and the Liverpool gentleman, and the two appraisers—Baker and Miller—came on according to the arrangement. I wanted to take Miller and Baker around the ruins and give them some instructions about the building and porch. But the Lycoming gentleman objected, and hurried them up. Miller seemed to be in just as big a hurry as the Lycoming gentleman was, and they would not give me any chance to show them anything about the building. I had left out some little things out of my memorandum and I wanted to explain to them. But they knew more about the building than I did, and they would not allow me to speak to the appraisers about it. They took them right off to the 'squire's office and had them sworn in, and ran them down to the hotel to get them to work as quickly as possible. I went to the hotel with them. Our friend Baker wanted a drink of water. The Lycoming gentleman said, ' Oh, no! you can't have any water; you must have

a pitcher of lemonade.' He stood at the head of the stairs and called on somebody to bring up some lemonade. Mr. Stewart got the lemonade and brought it up, when our friend there said to Baker, 'I suppose you would like to have a stick in it.' Baker declined, and said he did not wish a stick in his. They then went into the room and locked themselves in and I went away. I saw that I was not to get any lemonade—that I was to be cut short—and I concluded there was no use of my staying there. Sometime in the forenoon I saw them promenading on the street with the insurance men—hunting up evidence, down to Fulton's mill, and around the ruins of the building—but they took good care to stay away from me. When evening came, and just a short time before the train came, the insurance men walked down to my place and wanted me to come up to the hotel with them. When I went up the old gentleman said, 'They have made a very liberal award for you.' I said, 'All the better." They took me into the room where the appraisers were, and I got them to read the list over to me, so I could get a copy of it as they read it. Weeks wrote it off as they read it, for a copy for himself. I took the copy and then said that I would not accept the award, as they had left out the biggest part of my house. They had left out the back porch and had only fifty-one doors instead of fifty-nine, and had put the plastering too low, and I would not therefore accept the award."

The defendants produced evidence, including the testimony of the appraisers, negativing misconduct or fraud in the appraisement.

The defendant presented, inter alia, the following point: 3. That there is no evidence sufficient to show fraud or misconduct on the part of the arbitrators. *Answer.*—It is for the jury to say, under all the evidence, if there was fraud or misconduct, and this must be clearly and satisfactorily proved.

Verdict for the plaintiff for $2,517.33, and judgment thereon, whereupon the defendant took this writ of error, assigning for error the submission to the jury of the question of fraud and the refusal of the above point.

*Edgar & Frank Cowan,* for the plaintiff in error.

*John F. Wentling* and *James S. Moorhead,* for the defendant in error, cited Robinson v. Bickley, 6 Cas. 385.

Mr. Justice Gordon delivered the opinion of the court, November 7th 1881.

As a copy of the policy of insurance upon which this suit was brought has not been furnished for our inspection, we are not prepared to say that the answers of the court below to the

defendant's 5th and 9th points are incorrect. We have, however, no hesitation in pronouncing the answer to the 3d point erroneous. We have examined the evidence with care, and have failed to discover that the arbitrators were guilty of the slightest misconduct. These arbitrators or appraisers were chosen by the parties under an agreement in writing duly and deliberately executed, and by the terms of that agreement they were to appraise and estimate the true cash value of the loss. They were chosen because they were practical builders, and were expected to make their own estimates, and from those estimates form their judgment.

Therefore, that they went to a planing mill to ascertain the price of lumber, and to a tinsmith to learn the price of roofing tin, so far from being evidence of misconduct, was proof of care and consideration—of a disposition to inform themselves of the ruling prices of the materials that had composed the building. They examined the ruins, took what measurements were necessary, listened to what information Goehring had to give them, received from him a plan of the building, and, if he is to be believed, he put into their possession an estimate made for im by Greenawalt, an act that looks more like an attempt to improperly influence the arbitrators than any other in the case. Then, after they got all the information they thought necessary, and they were the sole and exclusive judges of what was necessary, they retired to a room in the hotel, and there by themselves, both parties being excluded, they made their estimate and award. That this estimate was a fairly correct one is evidenced by the fact that Miller offered to rebuild the property for the amount of the award, a proposition which the plaintiff refused to accept. This, then, is the testimony of the arbitrators themselves, nor does the evidence of Goehring, when trimmed of its obvious exaggerations, seriously contradict it. Leaving out the testimony as to the manner in which these men did the work to which they were appointed, the legal presumption is that they did their duty, and that presumption is not rebutted by such evidence as that of the plaintiff. That the "Liverpool gentleman" and the "Lycoming gentleman" hurried the arbitrators up so that he had no time to make his explanations and to show them "some little things" which he had left out of his memorandum; the running of the arbitrators down to the hotel in order that they might get to work as soon as possible; the call of the "Lycoming gentleman" for lemonade instead of water, of which he imagined he was not to partake, and, finally, how that in the forenoon he saw the arbitrators "promenading the street with the insurance men, hunting up evidence, down to Fulton's mill and around the ruins of the building; but they took good care to stay away from me,"

[Allison *v*. Commonwealth.]

which means that, for his own purposes, he took good care to stay away from them. Such evidence as this, so evidently partial, and with such a tone of flippant exaggeration running through it, goes but a very little way to the overthrowing of the award of a board of appraisers of the plaintiff's own choosing. One-sided and warped as this testimony evidently is, it reveals nothing that in the slightest degree impeaches the integrity of the board of arbitrators. What if they were hurried up? Perhaps that was necessary to expedite the business in hand, and, at all events, it was no fault of the arbitrators that the insurance men hurried them up.

That they were promenading the street in search of evidence, so far from being a misfeasance, was, as we have already shown, in the line of their duty.

Then, again, the mistake complained of, if mistake there was, which is doubtful, was of a character so insignificant as to be unworthy of attention. Even were it much more important than it is alleged to be, it could not be used to set aside the award: Speer *v*. Bidwell, 8 Wr. 23.

The judgment is reversed.

A venire facias de novo was subsequently awarded.